# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAY 0 4 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

| | |
|---|---|
| BEVERLY A. CARTY,<br>Plaintiff, | )<br>)<br>) |
| | ) Civil Action No. 2:05cv00045 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| JO ANNE B. BARNHART,<br>**Commissioner of Social Security,**<br>Defendant. | )<br>) By: Glen M. Williams<br>) Senior United States District Judge<br>) |

In this social security case, the court vacates the final decision of the Commissioner denying benefits and remands the claim to the Commissioner for further development consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Beverly A. Carty, ("Carty"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

Case 2:05-cv-00045-GMW-PMS   Document 17   Filed 05/04/06   Page 1 of 30   Pageid#: 60

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Carty protectively filed her second application for DIB on or about October 28, 2003, alleging disability as of October 15, 1995, based on type I diabetes, a thyroid condition, kidney damage, neuropathy, numbness in her hands and feet, high cholesterol, bronchitis and nerves. (Record, ("R."), at 39-43, 57-62, 80.) Her claim was denied both initially and on reconsideration. (R. at 29-33, 34, 35-37.) Carty then requested a hearing before an administrative law judge, ("ALJ"). (R. at 38.) The ALJ held a hearing on March 1, 2005, during which Carty was represented by counsel. (R. at 271-85.)

By decision dated April 14, 2005, the ALJ denied Carty's claim. (R. at 16-21.) The ALJ found that Carty was insured for DIB purposes through the date of the decision. (R. at 20.) The ALJ further found that Carty had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that Carty suffered from an impairment or combination of impairments considered "severe," but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that Carty's subjective allegations were not totally credible. (R. at 20.) The ALJ concluded that Carty retained the residual

functional capacity, ("RFC"), to perform light work,[1] which allowed her to perform her past relevant work as an assistant librarian. (R. at 20.) Thus, the ALJ found that Carty was not under a disability as defined by the Act, and therefore, she was not eligible for DIB benefits. (R. at 21.) *See* 20 C.F.R. § 404.1520(f) (2005).

After the ALJ issued his opinion, Carty pursued her administrative appeals, (R. at 11-12), but the Appeals Council denied her request for review. (R. at 5-8.) Carty then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court on Carty's Motion For Summary Judgment filed February 16, 2006, (Docket Item No. 12), and the Commissioner's Motion For Summary Judgment, filed March 20, 2006. (Docket Item No. 14).

## II. Facts

Carty was born in 1969, (R. at 274), which classifies her as a younger person under 20 C.F.R. § 404.1563(c). Carty completed high school and has past relevant work experience as an assistant librarian and a cashier. (R. at 58, 61.)

At her hearing, Carty testified about her past work experience. (R. at 274-76.) Carty stated that she quit a previous position at Pizza Plus after three months because she could no longer handle the stress of the job. (R. at 274-75.) Carty testified that her next position was at Dixie Pottery as a cashier, which was a job that sometimes

---

[1]The regulations define light work as work that involves lifting objects weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2005).

required lifting items weighing 20 to 30 pounds. (R. at 275-76.) Carty indicated that her next position as assistant librarian required the use of computers and was mostly a sedentary position. (R. at 276.) Carty stated that her last position was as a substitute teacher, which was a part-time job. (R. at 276.)

When asked by her attorney why she believed she could no longer work, Carty testified that it was mainly because of diabetes. (R. at 276.) Carty explained that she was insulin-dependent and required the use of an insulin pump. (R. at 276.) Even with the use of an insulin pump, Carty testified that she had difficulty controlling her blood sugar. (R. at 276.) Carty explained that she had suffered from diabetes for 21 to 22 years. (R. at 276.) Carty further testified that she had visited the emergency room several times for her diabetes when her blood sugar had gotten low. (R. at 283.) Carty described one time in particular when her blood sugar was so low she could not even walk. (R. at 284.) Carty stated that the last time she visited the emergency room, she received a glucogen shot. (R. at 284.) Carty surmised that her diabetes was worsening because any stress aggravated her condition and she remained fatigued throughout the day. (R. at 284.)

Carty also testified to the medical problems she experienced as a result of diabetes. (R. at 276-79.) Carty stated that she suffered from neuropathy in her legs and feet. (R. at 276.) Carty indicated that she had undergone a nerve conduction study on her hands when she had carpal tunnel surgery but had not had a nerve conduction study performed on her feet. (R. at 277.) Carty testified that her doctor simply gave her medicine for the neuropathy in her feet. (R. at 277.) Carty further testified that the neuropathy affected her gait in that she tended to stomp her feet and hit things more often than she used to. (R. at 277.) Carty stated that she also suffered from chronic yeast infections because of her blood sugar. (R. at 278.) Carty also

testified that she suffered from ulcerations that had been slow to heal and had left scars on her body. (R. at 280.) When asked if she had suffered any visual problems because of diabetes, Carty stated that her latest diagnosis revealed no visual problems but that she had previously been diagnosed with broken blood vessels. (R. at 280-81.)

Carty also testified that she suffered from a thyroid problem, for which she took a thyroid supplement. (R. at 277.) Carty stated that the thyroid supplement was unable to control her thyroid levels, and her cholesterol also remained unstable. (R. at 277.) Carty further testified that she had suffered some kidney damage, which resulted in her kidneys being unable to flush out fluids. (R. at 277.) Carty testified that she took medication for this condition. (R. at 277.) Carty also stated that she took Zoloft but did not see a mental health professional. (R. at 278.) Carty further testified that she had recently been diagnosed with asthma, for which she used two inhalers and Advair daily. (R. at 281-82.) Carty admitted that she smoked but stated that she had decreased her frequency of smoking by one-half. (R. at 282.)

Carty explained that she could not return to work as a cashier because she could not handle the public due to her nerves. (R. at 278.) Carty stated that she also could not return to work as a librarian because her legs and ankles swelled when she sat for any length of time. (R. at 278.) Carty testified that she elevated her legs approximately four to five hours a day. (R. at 283.) Carty stated that she attempted to keep her legs elevated at night but was often unsuccessful due to tossing and turning. (R. at 283.) Carty further testified that she took a fluid pill for the swelling, but it did not reduce the inflammation in her legs and ankles. (R. at 283.)

Carty briefly described her daily activities in her testimony. (R. at 279-80.) Carty stated that she rested throughout the day and managed to prepare meals for her

family. (R. at 279.) Carty testified that she did not drive very often because she did not trust herself to drive. (R. at 279.) Carty denied much of a social life and stated that she attended Sunday church services approximately once a month. (R. at 280.) Carty indicated that she tested her blood sugar six to eight times a day. (R. at 280.)

In rendering his decision, the ALJ reviewed medical records from Mountain City Medical Center; Johnson County Health Center; Dr. Samir S. Missak, M.D.; R. J. Milan, Jr, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Andrew J. Chapman, M.D.; Blue Ridge Medical Specialists; and Dickenson Community Hospital. Carty's counsel also submitted additional medical records from Dr. Missak and Dickenson Community Hospital to the Appeals Council.[2]

On March 4, 1998, Carty visited Mountain City Medical Center to get her thyroid checked. (R. at 149, 175.) Carty also complained of heartburn and swelling. (R. at 149.) She was diagnosed with a hypothyroid and gastroesophageal reflux disease, ("GERD"), and was prescribed Synthroid. (R. at 149.) Carty returned to Mountain City Medical Center on August 3, 1998, with complaints of fluid in her body that caused numbness in her arms and hands. (R. at 149, 172.) Tests were performed that indicated that Carty's thyroid stimulating hormone levels were out of range, so her dosage of Synthroid was increased. (R. at 172.) On September 1, 1998, complained of sneezing, coughing, headache, sore throat and earache. (R. at 148.) She was assessed with sinusitis and was given Sudafed. (R. at 148.) Carty returned to Mountain City Medical Center on September 15, 1998, for treatment of her persistent cough. (R. at 147-48.) Carty also complained of a yeast infection. (R. at

---

[2]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-6-

148.) Carty was diagnosed with vaginitis, for which she was given Monistat, and a chronic cough. (R. at 147.)

Carty visited Mountain City Medical Center on October 1, 1998, to have her thyroid checked. (R. at 147, 170.) Tests showed that Carty's thyroid stimulating hormone levels were out of range. (R. at 170.) Carty also requested medication for a yeast infection. (R. at 147.) On November 18, 1998, Carty underwent a physical examination, which revealed post-nasal drainage and a cough. (R. at 145-46.) Carty was diagnosed with a headache and sinusitis and was prescribed isocet and Nasacort. (R. at 145.) On January 22, 1999, testing revealed that Carty's hemoglobin A1C levels and her thyroid stimulating hormone levels were out of range. (R. at 168.) On March 16, 1999, Carty complained of nausea and fluctuations in her blood sugar levels. (R. at 143-44.) She was prescribed Phenergan and was instructed to take one-half less her usual dosage of insulin that night. (R. at 143.) On April 14, 1999, Carty complained of congestion, a sore throat, cough and chest pains when coughing. (R. at 141-42.) Carty was assessed with a cough, was prescribed Bactrim and was instructed to take Sudafed and Robitussin and to increase her fluid intake. (R. at 141.)

Carty returned to Mountain City Medical Center on May 4, 1999, complaining of soreness in her ribs and a cough. (R. at 139-40.) Carty was diagnosed with costochonditis and was prescribed Naprosyn. (R. at 139.) On May 29, 1999, Carty had her thyroid stimulating hormone levels tested, and the results were within normal ranges. (R. at 167.) Carty was instructed to stay on her medications. (R. at 167.) On September 8, 1999, Carty complained of a rash on her abdomen and neck pain. (R. at 135-36, 165.) She was assessed with muscle strain and dermatitis and was

prescribed Flexeril and Aristocort. (R. at 135.) Lab tests indicated that Carty's glucose, occult blood and protein levels were out of range. (R. at 165.) On October 15, 1999, Carty's C-peptide, total tein, glucose and hemoglobin A1C levels were out of range. (R. at 161.)

On September 24, 1999, Carty returned to Mountain City Medical Center with complaints of cough and congestion and a 13-pound weight gain over the previous month. (R. at 133-34, 164.) Carty was diagnosed with sinusitis and weight gain and was prescribed Augmentin. (R. at 133.) A thyroid panel indicated that Carty's thyroid stimulating hormone levels were out of range. (R. at 164.)

On November 12, 1999, Carty's glucose levels were out of range at 3+, and there was a trace of protein in her blood, which was out of range. (R. at 160.) Carty's protein levels also were out of range at 2+, but her thyroid stimulating hormone was within range at 2.3 H mciu/ml. (R. at 160.) On December 14, 1999, Carty complained of soreness in her face, sneezing and coughing. (R. at 131-32.) Carty also requested treatment for her nerves, as her ex-husband was causing stress. (R. at 132.) Carty, however, denied any suicidal ideation or intention. (R. at 132.) Carty was assessed with sinusitis and depression/anxiety and was prescribed Augmentin and Desyrel. (R. at 131.) Carty refused a referral for mental health treatment, and indicated that she spoke with her mother about her mental health problems. (R. at 131.) On March 29, 2000, Carty complained of pain in her wrists and numbness in her thumbs. (R. at 129-30.) During the appointment, Carty stated that she no longer wanted to visit Dr. Peius because she believed she could control her blood sugar better herself. (R. at 130.) Carty was assessed with wrist pain, which was probably caused by carpal tunnel syndrome, increased blood pressure and proteinuria. (R. at

129.) Carty was referred to an orthopedic specialist and was given Lotensin. (R. at 129.)

A thyroid panel run on March 31, 2000, indicated that Carty's T-3 uptake levels were out of range at 40 H percent. (R. at 157-58.) Her glucose levels also were out of range at 409 H mg/dl, as were her hemoglobin A1C levels at 11.0 H percent total HGB. (R. at 158.) A note on the lab report states that Carty would not commit to increasing her insulin intake and refused to visit Dr. Peius again. (R. at 158.) She was advised that if she did not better control her sugars, she could go blind, lose her kidneys and legs or suffer a stroke or myocardial infarction. (R. at 158.) Carty stated that her glucometer was new, but she did not think that it was working improperly. (R. at 158.) Carty visited Mountain City Medical Center on May 17, 2000, with complaints of fever and chills. (R. at 127-28.) She was diagnosed with strep pharyngitis and cough and was prescribed Amoxil. (R. at 127.) On May 19, 2000, Carty reported that she had experienced no relief from her cough. (R. at 125-26.) Carty also complained of frequent sweating and dizziness. (R. at 126.) She was assessed with allergic rhinitis and mouth soreness. (R. at 125.) It was recommended that she use Vancanese in each nostril, take Sudafed and use Miracle Mouthwash. (R. at 125.)

Carty returned to Mountain City Medical Center on September 18, 2000, with complaints of heartburn, which was worse after eating, and burning upon urination. (R. at 123-24.) She was diagnosed with indigestion, a urinary tract infection and proteinuria and was prescribed Tagamet and Bactrim. (R. at 123.) On October 10, 2000, lab results indicated that Carty's thyroid stimulating hormone levels were out of range at 143 H mciu/ml. (R. at 120-21, 159.) However, Carty refused to increase

Case 2:05-cv-00045-GMW-PMS   Document 17   Filed 05/04/06   Page 9 of 30   Pageid#: 68

her insulin, as she stated that she would rather have high blood sugar than low blood sugar. (R. at 159.) Carty was warned of the risk of blindness, kidney failure, myocardial infarction, stroke and decreased circulation which could lead to amputation that could result from high blood sugar. (R. at 159.) Carty indicated that she would watch her diet. (R. at 159.) A note on the lab report states that Carty had not been compliant and probably was not taking her medications. (R. at 159.) Carty was diagnosed with diabetes mellitus, a hypothyroid and allergic rhinitis. (R. at 120.) Her prescription of Synthroid was refilled, and she was given Nasacort and Chlor-Trimeton. (R. at 120.)

Carty returned to Mountain City Medical Center on November 14, 2000, with complaints of a sore throat, fever and chills. (R. at 118-19.) She was diagnosed with viral syndrome and a canker sore, was given Lidocaine and was advised to increase her fluid intake. (R. at 118.)

On December 11, 2000, Carty complained of nausea, vomiting, diarrhea, chills and stomach cramps. (R. at 116-17.) She was assessed with acute gastroenteritis, was prescribed Phenergan and was counseled to watch her blood sugars. (R. at 116.) On January 24, 2001, Carty complained of a lump on her left wrist that was worsening and causing stiffness. (R. at 114-15.) She was diagnosed with a lesion on her wrist and was referred to an orthopedic specialist. (R. at 114.) On April 19, 2001, sutures were removed from her left wrist. (R. at 112-13.) She informed the office that she had undergone surgery on her hand. (R. at 113.)

Carty returned to Mountain City Medical Center on September 26, 2001, with reports of heartburn that prevented her from eating or drinking. (R. at 110-11, 156.)

Lab reports indicated that Carty's A1C hemoglobin levels were out of range at 10.5 percent, her microalbumin levels were out of range at 95.1 mg/dl, her microalbumin/creat ratio was out of range at 1,026.9 mg/g and her urn protein levels were out of range at 114 mg/dl. (R. at 156.) Carty was advised to visit a diabetic clinic, but she refused by stating that she had already been and the clinic had messed up her insulin. (R. at 156.) Carty was diagnosed with diabetes mellitus, a hypothyroid, proteinuria, decreased foot sensation and increased heartburn. (R. at 110-11.) On October 3, 2001, Carty reconsidered and decided she would visit the diabetic center because she had been under a great deal of stress. (R. at 156.)

On November 27, 2001, Carty complained of a cough, fever, chills and a sore throat. (R. at 108-09, 155.) Carty's blood chemistry was tested, and her glucose levels were out of range at 256 mg/dl, her alkaline phosphatase levels were out of range at 159 u/l, her total protein levels were out of range at 5.7 g/dl and her albumin levels were out of range at 3.2 g/dl. (R. at 155.) She was assessed with acute bronchitis and a urinary tract infection, was prescribed Augmentin and Combivent and was advised to take Robitussin, Pneumotussin and Sudafed. (R. at 108.) Carty returned to Mountain City Medical Center on December 20, 2001, with complaints of a sore throat, congestion and chills. (R. at 106-07.) She was diagnosed with pharyngitis and a urinary tract infection and was prescribed Amoxil. (R. at 106.) On January 25, 2002, Carty had her blood chemistry tested and her glucose levels were out of range at 146 mg/dl, her alkaline phosphatase levels were out of range at 119 u/l, her albumin levels were out of range at 3.7 g/dl, her A1C hemoglobin levels were out of range at 11.3 percent and her thyroid stimulating hormone was out of range at 0.21 mciu/ml. (R. at 153.) A note on the lab report indicates that Carty's dosage of Lantus was to be increased and her use of Synthroid was to be decreased. (R. at 153.)

On February 14, 2002, Carty visited Mountain City Medical Center for refills of Protonix and a physical examination for work. (R. at 104-05.) Carty reported increased stress in her life, nervousness and depression but denied any suicidal ideation or intention. (R. at 105.) She was assessed with GERD and depression/anxiety but was given an overall healthy diagnosis. (R. at 104.) She further received a refill of Protonix and a prescription for Zoloft. (R. at 104.) On June 13, 2002, Carty complained of allergies. (R. at 102-03, 152.) She reported that she was doing well, and her sugars were stable. (R. at 103.) Carty's blood chemistry report showed that her glucose levels were out of range at 123 mg/dl and her A1C hemoglobin levels were out of range at 11.3 to 12.2 percent. (R. at 152.) A note on the lab report indicated that Carty's dosage of Lantus was increased and she was told to do a sliding scale to regulate her insulin. (R. at 152.) Carty was assessed with diabetes mellitus, a hypothyroid, proteinuria, GERD, stable depression and allergic rhinitis, and she obtained refills of Synthroid, Protonix and Zoloft. (R. at 102.)

Carty was treated at Mountain City Medical Center on September 5, 2002, for candida, for which she was given Lotrimin. (R. at 100.) She also was seen on September 11, 2002, for treatment of bronchitis. (R. at 98-99.) She returned when her cough did not improve. (R. at 96-97.) She was assessed with acute bronchitis and was given a Z-pak. (R. at 96.) On October 14, 2002, Carty had her blood chemistry tested, which revealed her glucose levels were out of range at 308 mg/dl and her A1C hemoglobin levels were out of range at 12.5 percent. (R. at 151.) Carty had her dosage of Lantus increased and was counseled to do the sliding scale to regulate her insulin before each meal. (R. at 151.) On November 4, 2002, Carty presented with complaints of a severe headache in the right side of her face, congestion and a sore throat. (R. at 94-95.) She was diagnosed with acute bronchitis and a urinary tract

-12-

infection and was told to use Zithromax, Combivent, Difil, Robitussin, Sudafed and ibuprofen. (R. at 94.)

Carty visited the emergency room at Johnson County Health Center on November 3, 2002, for congestion, nasal discharge, a sore throat, cough, night sweats and weight loss that had lasted continuously for four days. (R. at 176-80.) X-rays of Carty's chest showed a clear lung field, and her cardiomediastinal silhouette seemed unremarkable. (R. at 180.) Upon an examination, Dr. J. Ross, M.D., diagnosed Carty with a viral urinary tract infection, pneumonia and bronchitis. (R. at 178.) Carty was given prescriptions and was discharged from the hospital. (R. at 178.)

On January 13, 2003, Carty visited Mountain City Medical Center for congestion and a cough. (R. at 92-93.) She was prescribed Augmentin, Allegra and Diflucan. (R. at 92.) On May 22, 2003, Carty complained of pain in her right foot. (R. at 90-91.) She also needed a refill of Allegra. (R. at 91.) Carty was diagnosed with plantar's warts and callus feet and was given a refill of Allegra. (R. at 90.)

Carty visited Johnson County Health Center on June 10, 2003, for an evaluation of pain in the bottom of her right foot. (R. at 181.) Carty also related that she had bunions. (R. at 181.) Alainya M. Hare, D.P.M., determined that Carty's lesions on her right foot were either clogged sweat glands or just deep-seated corns. (R. at 181.) There also was hyperkeratotic tissue noted in the lower aspect of Carty's hallux and first metatarsal head, which Hare debrided. (R. at 181.) Hare instructed Carty on appropriate foot care and accommodative shoes and advised her on appropriate powder in shoes and padding. (R. at 181.)

-13-

Carty had her blood chemistry tested on July 22, 2003. (R. at 150.) The results of the test revealed that Carty's glucose levels were out of range at 207 mg/dl, her A1C hemoglobin levels were out of range at 10 percent, her microalbumin levels were out of range at 750 mg/dl, her microalbumin creat ratio was out of range at 3,877.9 mg/g and her urn protein was out of range at 827 mg/dl. (R. at 150.) A note on the lab report stated that Carty refused to see Endo because she had been twice and believed it was a waste of Tennessee money. (R. at 150.) The note further stated that Carty was taking only 40 units of Lantus, which caused her blood sugar to drop, and only occasionally used the sliding scale to regulate her blood sugar. (R. at 150.)

On August 11, 2003, Carty visited Mountain City Medical Center complaining of increased stress. (R. at 88-89.) She was assessed with diabetes mellitus, a hypothyroid, proteinuria and depression. (R. at 88.) Carty was prescribed Lantus to help regulate her insulin and had her dosages of Synthroid and Zoloft increased. (R. at 88.) Carty also was given a refill of Protonix and was once again advised of the risks associated with uncontrollable diabetes mellitus. (R. at 88.) Carty verbalized understanding of the risks and requested a copy of a sliding scale insulin schedule. (R. at 88.)

On October 28, 2003, Carty saw Dr. Samir S. Missak, M.D., for a follow-up appointment. (R. at 193.) A urinalysis showed that Carty's protein and glucose levels were 3+, while a basic metabolic panel confirmed that Carty's glucose levels were high. (R. at 200-01.) Carty's cholesterol, hemoglobin A1C, albumin and TSH levels also were high. (R. at 200-01.) Dr. Missak diagnosed Carty with brittle type-I diabetes, hypothyroidism, GERD and sinus allergy. (R. at 193.) Carty was counseled about foot care, was given an influenza vaccination and was prescribed Lantus. (R. at 193.)

-14-

Carty visited Dr. Missak's office on November 7, 2003, with complaints of a headache, cough, sore throat and wheezing. (R. at 192.) Dr. Missak assessed Carty with brittle type-I diabetes, hypothyroidism, GERD, sinus allergy, hypercholesterolemia and acute bronchitis. (R. at 192.) Carty was given a prescription for Levaquin, was advised of a low cholesterol diet, was told to increase her dosage of Synthroid and Cozaar and to continue her use of Lantus and was referred to Dr. Matthew D. Beasey, M.D., for an endocrine consultation. (R. at 192.)

On November 13, 2003, Carty saw Dr. Missak for continued tightness in her chest and swelling in her hands and feet. (R. at 187.) Carty related that she was unable to obtain Cozaar because her insurance company would not cover the expense. (R. at 187.) Dr. Missak diagnosed Carty with acute bronchitis and diabetic proteinuria and gave her samples of Levaquin and Diovan. (R. at 187.) Dr. Missak also advised Carty to increase her protein intake. (R. at 187.)

On December 29, 2003, Carty returned to Dr. Missak's office for check-up appointment. (R. at 188-91.) Dr. Missak let his earlier diagnoses stand and advised Carty to check her blood sugar three times a day before meals. (R. at 191.) Dr. Missak also suggested Carty visit an optometrist for a diabetic eye examination. (R. at 191.) Carty was prescribed Keflex and Difil and was counseled to quit smoking. (R. at 191.)

On January 7, 2004, a basic metabolic panel and a lipid panel were run on Carty's blood. (R. at 198-99.) The tests revealed that Carty's glucose and calcium levels were low, while her cholesterol and thyroid stimulating hormone levels were high. (R. at 198.)

Carty visited Dr. Missak's office on January 14, 2004, for a follow-up appointment. (R. at 186.) Carty's protein levels were extremely high, and Dr. Missak increased Carty's use of Synthroid, continued Carty's use of Lantus and prescribed Zoloft. (R. at 186, 197.)

Carty visited Blue Ridge Medical Specialists, P.C., on January 29, 2004, for an endocrine consultation. (R. at 231-32, 236-37.) Dr. Beasey noted in a letter to Dr. Missak that Carty suffered from a 20-year history of diabetes mellitus, which had historically been uncontrolled secondary to lack of education and her own poor follow-up over the years. (R. at 231.) Currently, Carty was experiencing low blood sugars between 3 a.m. and 6 a.m. and was only sometimes following a diabetic diet. (R. at 231.) Carty also reported that she had not been to an optometrist in more than two years. (R. at 231.) Carty stated that she felt tired and fatigued and had been suffering from blurry vision, nasal congestion, allergies, hoarseness, wheezing, cough, nausea, vomiting, indigestion, constipation, calluses, numbness and tingling in her feet and some hypoglycemic seizures. (R. at 231.) A lipid panel with LDL/HDL ratio was run, which indicated that Carty's total cholesterol was 238 H mg/dl, her triglycerides were 240 H mg/dl and her LDL cholesterol was 140 H mg/dl. (R. at 236.) Carty's C-Peptide serum was less than 0.5 mg/ml. (R. at 236.) Dr. Beasey discussed with Carty diabetic control and informed her that she was running out of time to control her diabetes to prevent further complications. (R. at 232.) Dr. Beasey further instructed Carty to discontinue her use of Lantus the following day but to use Novolog instead. (R. at 232.) Dr. Beasey also referred Carty to a course on carbohydrate counting at the Diabetes Treatment Center. (R. at 232.) Carty was assessed with hypothyroidism, neuropathy, which was nonpainful at that point, tobacco abuse, hypercholesterolemia and retinopathy. (R. at 232.) Dr. Beasey also found that Carty had mildly diminished systolic blood pressure, which could be evidence of peripheral disease. (R. at 232.)

-16-

R.J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), for Carty on February 24, 2004. (R. at 202-14.) In the PRTF, Milan concluded that Carty had an affective disorder that was nonsevere but that she also had a coexisting nonmental impairment that required referral to another medical speciality. (R. at 202.) Milan determined that Carty's affective disorder, depression, did not precisely satisfy the diagnostic criteria for disability benefits. (R. at 205.) Milan found that Carty was not limited in activities of daily living, in maintaining social functioning or in maintaining concentration, persistence or pace. (R. at 212.) Milan found that Carty was not limited by repeated episodes of decompensation. (R. at 212.) Milan considered Carty's daily activities of housework, driving an automobile, laundry, washing dishes, cooking meals, shopping at the supermarket, reading, visiting parents and washing her stepdaughter's hair. (R. at 214.) Milan also noted that Carty had no difficulty understanding or remembering and performed her own personal care. (R. at 214.) Milan further considered medical records from Mountain City Medical Center, but found that the family nurse practitioner was not an acceptable source, and also considered records from Dr. Missak's office. (R. at 214.) Milan indicated that Carty's allegation of disability was partially credible, as the record revealed that Carty's primary allegations of disability were physical and she had undergone no mental health treatment. (R. at 214.) These findings were affirmed on June 1, 2004, by Howard Leizer, Ph.D., another state agency psychologist. (R. at 202.)

An addendum to this PRTF by Dr. Frank M. Johnson, M.D., a state agency physician, states that Carty also alleged high cholesterol, bronchitis, diabetes mellitus, kidney problems, neuropathy, numbness in the hands and feet and nerves; however, Dr. Johnson found her allegation of complete disability due to these impairments not supported by the evidence of record and, therefore, not credible. (R. at 215-216.) Dr.

-17-

Johnson found relevant that there was no evidence of severe end organ damage or evidence of significant weight loss from Carty's digestive condition. (R. at 216.) Dr. Johnson also noted that recent examinations showed that Carty had a normal gait and station and motor function. (R. at 216.) Furthermore, Dr. Johnson found no diagnosis in the file documenting neuropathy, and Carty's most recent examination indicated that her sensation was intact. (R. at 216.) Dr. Johnson found Carty's physical impairments nonsevere. (R. at 216.) These findings were affirmed on June 2, 2004, by Dr. Randall Hays, M.D., another state agency physician. (R. at 216.)

On March 15, 2004, Carty had x-rays of her chest taken at Dickenson Community Hospital. (R. at 195.) The final impression was that Carty did not suffer from acute cardiopulmonary disease. (R. at 195.) Carty had a basic metabolic panel and lipid panel run on March 22, 2004, which revealed that her sodium and calcium levels were low, while her glucose and cholesterol were high. (R. at 196.)

On April 20, 2004, Carty presented to Dr. Missak's office with complaints of cough, fever and chest congestion. (R. at 183.) Dr. Missak diagnosed Carty with acute bronchitis, prescribed Ancef, Hycotuss and Levaquin and once again advised Carty to quit smoking. (R. at 183.) Carty returned to Dr. Missak's office on April 26, 2004, upon belief that she had broken a rib from coughing. (R. at 182.) Carty complained of a pain in her left rib cage area and related that Hycotuss did not help with her cough. (R. at 182.) Dr. Missak took x-rays of Carty's ribs and chest, which revealed no displaced rib fracture or osseous destruction (R. at 182, 194.) Carty's cardiac size was normal, and there was no pulmonary edema, acute infiltrates, pleural effusion or pneumothorax. (R. at 194.) Carty was prescribed Ancef, Difil, Tessalon and Lantus. (R. at 182.)

-18-

On May 3, 2004, Carty visited Blue Ridge Medical Specialists for a follow-up appointment. (R. at 230.) Carty reported that she was checking her blood sugar three to four times daily, and her readings were usually between 150 and 300 with only a rare episode of hypoglycemia. (R. at 230.) Carty also stated that she got slightly symptomatic when her sugars were below 100. (R. at 230.) Carty informed Elaine White, F.N.P., that she counted her carbohydrate intake and tried to stay active, although she had no consistent exercise. (R. at 230.) White noted that Carty had been sending her sugar readings to the office, which indicated that at 15 u, Carty had some hypoglycemia, and at 12 u, she had frequent readings in the 200s at bedtime. (R. at 230.) Carty expressed interest in obtaining an insulin pump. (R. at 230.) White assessed Carty with hypothyroidism, neuropathy, hypercholesterolemia, stable retinopathy and proteinuria. (R. at 230.) With regard to Carty's proteinuria, White noted that Carty's initial spot urine for microalbumin and creatinine ratio in January was greater than 127 mcg, which is why Dr. Beasey raised Carty's dosage of Diovan to 160 milligrams daily. (R. at 230.) White indicated that they would recheck Carty's spot urine for her microalbumin and creatinine ratio. (R. at 230.)

On March 22, 2004, Carty returned to Dr. Missak's office for treatment of her persistent cough and calluses on her feet. (R. at 185.) Dr. Missak gave Carty Nasacort samples and prescriptions for Synthroid, Allegra-D, Protonix, Zoloft, Diovan and furosemide. (R. at 185.) Dr. Missak also referred Carty to Dr. Andrew J. Chapman, D.P.M., for treatment of the calluses on her feet. (R. at 185.)

On May 26, 2004, Carty visited Dr. Chapman for a physical examination of her lower extremities. (R. at 218-20.) Her pedal pulses were palpable in both lower extremities, and her plantar protective sensation was intact in both lower extremities via Semmes-Weinstein monofilament testing. (R. at 218.) There also were multiple

-19-

punctate keratomas at the plantar aspect of her forefoot bilaterally at the level of the second metatarsal bone head. (R. at 218.) Dr. Chapman made a diagnosis of intractable plantar keratoses and treated via enucleation of the lesions and by a prescription for topical urea compound. (R. at 218.) Dr. Chapman further advised Carty that he saw no clinical evidence of sensory neuropathy; however, since she related subjective complaints consistent with early neuropathy, he prescribed her Neurontin for the management of her symptoms. (R. at 218.) Dr. Chapman also discussed with Carty appropriate diabetic foot care and precautions. (R. at 218.)

On June 19, 2004, Carty had a basic metabolic panel and lipid panel run, which indicated that her sodium and ALT levels were low, while her chloride, creatinine, glucose, cholesterol and thyroid stimulating hormone levels were high. (R. at 228.)

Carty returned to Dr. Missak's office on June 18, 2004, for treatment of a persistent cough and wheezing. (R. at 226.) Dr. Missak assessed Carty with a persistent cough and hypercholesterolemia, referred her to Dr. Rossu for her cough and wheezing and prescribed Singulair. (R. at 226.) On June 23, 2004, reported that Singulair had helped her symptoms. (R. at 225.) Carty requested that she be placed on a daily fluid pill. (R. at 225.) Dr. Missak let his earlier diagnoses stand and added that Carty could suffer from bronchial asthma. (R. at 225.) Dr. Missak prescribed Lipitor, Singulair and furosemide. (R. at 225.)

Carty returned to Blue Ridge Medical Specialists on August 3, 2004, reporting that she had used an insulin pump for approximately six weeks and believed it better controlled her diabetes. (R. at 229, 234-35.) Carty had no complaints other than some hypoglycemias before meals, which had been mild. (R. at 229.) Carty reported that her known neuropathy had not been worse. (R. at 229.) A lipid panel with LDL/HDL

ratio was run, which indicated that Carty's total cholesterol was 203 H mg/dl, her triglycerides were 69 H mg/dl, her HDL cholesterol was 73 H mg/dl and her LDL cholesterol was 116 H mg/dl. (R. at 234.) Dr. Beasey refilled Carty's prescription for strips lancets and gave her a bottle of Lantus insulin to use in case of pump malfunction. (R. at 229.) Dr. Beasey diagnosed Carty with hypothyroidism, stable neuropathy, high cholesterol and proteinuria. (R. at 229.) Dr. Beasey also advised Carty to quit smoking. (R. at 229.)

On August 25, 2004, Carty visited the emergency room at Dickenson Community Hospital because she had received a sugar reading at home of 42. (R. at 238-40.) The emergency medical service had given her a glucogen injection before her arrival at the hospital. (R. at 240.) The attending physician found Carty otherwise okay and determined there was no particular cause for her hypoglycemia. (R. at 238.) When Carty was released from the hospital, she had improved and was instructed to follow up with a doctor that specialized in diabetes. (R. at 239.)

Dr. Missak saw Carty again on November 3, 2004, for fever, cough, wheezing and sinus congestion. (R. at 224.) Upon an examination, Dr. Missak found tenderness over Carty's maxillary sinuses. (R. at 224.) Dr. Missak assessed Carty with acute sinusitis, acute bronchitis and diabetes and prescribed Avelox and Difil. (R. at 224.) Carty saw Dr. Missak on November 9, 2004, and had metabolic and lipid panels run. (R. at 227, 249-51.) The results showed that Carty's sodium and ALT levels were low, while her creatinine, glucose and thyroid stimulating hormone levels were high. (R. at 227.) Carty's cholesterol was desirable, her triglycerides normal, her LDL desirable, her cholesterol/HDL one-half average and her LDL/HDL average. (R. at 251.) Dr. Missak assessed Carty with hyperlipidemia, diabetes and hypothyroidism.

Case 2:05-cv-00045-GMW-PMS   Document 17   Filed 05/04/06   Page 21 of 30   Pageid#: 80

(R. at 249.)

On November 11, 2004, Carty returned to Dr. Missak's office with reports of continued coughing and chest congestion. (R. at 223.) Carty reported that she took the Avelox for only five days. (R. at 223.) Dr. Missak referred to his earlier diagnoses and then assessed Carty with bronchial asthma and acute bronchitis. (R. at 223.) Dr. Missak prescribed Ancef, gave Carty samples of Levaquin and increased her dosage of Synthroid and Lipitor. (R. at 223.) On November 23, 2004, Carty complained of cough, wheezing, low-grade fever and right-sided chest pain. (R. at 222, 252.) X-rays of Carty's chest were normal and showed no acute cardiopulmonary disease. (R. at 252-53.) Dr. Missak diagnosed Carty with bronchial asthma, acute bronchitis, right-sided chest pain, dyspenea and bronchospasm. (R. at 222, 252.) Carty was prescribed Ancef, Keflex, prednisone and Flovent. (R. at 222.) On November 30, 2004, Carty reported that she felt better and was tolerating Flovent. (R. at 221.) Carty further stated that her chest pain was better. (R. at 221.) Dr. Missak assessed her with bronchial asthma and resolving chest pain. (R. at 221.) Dr. Missak advised Carty to quit smoking to help symptoms associated with asthma, to obtain allergy testing and to try an air purifier with a HEPA filter. (R. at 221.)

On April 28, 2005, Carty was admitted to the emergency room at Dickenson Community Hospital for cough, congestion, a runny nose, drainage and mild trouble breathing. (R. at 254-62.) Images of Carty's chest showed two nodular densities in the right lateral lower lung zone, which possibly could be in Carty's middle lobe. (R. at 259.) Carty was assessed with acute bronchitis and was given prescriptions for Augmentin and Rondec. (R. at 255.)

Carty visited Dr. Missak's office on May 9, 2005, with complaints of right lung densities. (R. at 245.) Carty was once again advised to quit smoking and was informed that she would be given a referral to a pulmonologist if her densities persisted. (R. at 245.) On May 19, 2005, Carty had x-rays taken of her chest. (R. at 263-64.) Vague nodular densities were seen at the lateral aspect of Carty's right lower lung zone. (R. at 264.) The radiologist indicated that these findings could possibly be due to rib fractures. (R. at 264.) On May 27, 2005, a CT scan of Carty's chest without contrast was normal, except for some healing fractures at two sites in her right lower ribs. (R. at 246.) Images of her chest showed some vague nodular densities at the lateral aspect of Carty's right lower lung zone. (R. at 247.) The radiologist determined that these findings could possibly be due to rib fractures. (R. at 247.) Carty was assessed with lung densities. (R. at 244.)

Carty was admitted to the emergency room at Dickenson Community Hospital on June 18, 2005, for a cough, sore throat, fever and chills. (R. at 265-70.) She was diagnosed with acute bronchitis and was prescribed Erythromycin. (R. at 266.) She also was advised to eat yogurt three times a day to combat yeast infections. (R. at 270.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520. (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe

Case 2:05-cv-00045-GMW-PMS   Document 17   Filed 05/04/06   Page 23 of 30   Pageid#: 82

impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 & Supp. 2005); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated April 14, 2005, the ALJ denied Carty's claim. (R. at 16-21.) The ALJ found that Carty was insured for DIB purposes through the date of the decision. (R. at 20.) The ALJ further found that Carty had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 20.) The ALJ found that Carty suffered from an impairment or combination of impairments considered "severe," but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ found that Carty's subjective allegations were not

Case 2:05-cv-00045-GMW-PMS   Document 17   Filed 05/04/06   Page 24 of 30   Pageid#: 83

totally credible. (R. at 20.) The ALJ concluded that Carty retained the RFC to perform light work, which allowed her to perform her past relevant work as an assistant librarian. (R. at 20.) Thus, the ALJ found that Carty was not under a disability as defined by the Act, and therefore, she was not eligible for DIB benefits. (R. at 26-27.) *See* 20 C.F.R. § 404.1520(f) (2005).

Carty argues the ALJ's decision was not based on the substantial evidence of the record. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 6.) Specifically, Carty argues that the ALJ erred in finding that she could perform light work and return to her past relevant work. (Plaintiff's Brief at 6-11.) Carty further argues that substantial evidence does not support the ALJ's finding that she did not meet the listing for diabetes mellitus. (Plaintiff's Brief at 11-17.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical

-25-

evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger,* 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano,* 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Carty argues that substantial evidence does not exist in the record to support the ALJ's finding that she could perform light work and return to her past relevant work. (Plaintiff's Brief at 6-11.) Based upon my review of the evidence in this case, I agree. Social Security Ruling 96-8p provides that, "the RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis ... Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." S.S.R. 96-8p, WEST'S SOCIAL SECURITY REPORTING SERVICE, (West Supp. 2005). This ruling further requires an ALJ to include a narrative discussion in his decision describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). *See* S.S.R. 96-8p. An ALJ also must include in his narrative a discussion on the claimant's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., eight hours a day, for five days a week or an equivalent work schedule) and a description of the maximum amount of each work-related activity the individual can perform based on the evidence available in the case. *See* S.S.R. 96-8p.

The court finds the ALJ's determination of Carty's RFC severely lacking in substance, and as such, not supported by substantial evidence. The ALJ failed to assess Carty's work-related abilities on a function-by-function basis in his analysis of her RFC as required by Social Security Ruling 96-8p. The ALJ also neglected to include any medical evidence in support of his assessment of Carty's RFC or a discussion of the claimant's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis and a description of the maximum amount of each work-related activity she could perform based on the evidence available in the case. The ALJ merely found that Carty's daily activities were consistent with an ability to perform light work and stated that the record did not indicate pain of such severity as to interfere with Carty's ability to perform light work-related tasks. This evidence was the extent of the ALJ's support for his determination of Carty's RFC. The Commissioner's argument that the ALJ's determination finds its requisite support in the regulations and the record is unpersuasive because Social Security Ruling 96-8p clearly mandates that evidence to support the ALJ's assessment must be found in the form of a narrative in the ALJ's opinion. Since the ALJ did not explain his rationale for his determination of Carty's RFC in accordance with Social Security Ruling 96-8p, the court finds this assessment not supported by substantial evidence. Therefore, the ALJ's determination that Carty could return to her past relevant work as an assistant librarian also was in error. This court, however, finds unpersuasive Carty's assertion that there was insufficient evidence as to the demands of an assistant librarian position. Not only did Carty complete a Work History Report identifying the lifting, standing, walking, sitting, climbing, stopping, kneeling, crouching, crawling, handling, grabbing, grasping, reaching, writing and typing that the position required, but she also testified that the only reason she believed that she

-27-

could not return to the position was because her legs and ankles would swell. (R. at 66, 278.) As such, the court merely finds that the ALJ was unable to proceed with an analysis of whether Carty could return to her past relevant work because he failed to properly assess Carty's RFC.

To provide the ALJ with guidance upon remand, the court will address Carty's next argument, that the ALJ erred in finding that she did not meet the listing for diabetes mellitus. (Plaintiff's Brief at 11-17.) To qualify as disabled because of diabetes mellitus, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08 provides that, in addition to suffering from diabetes mellitus, a claimant also must suffer from:

> A) Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11:00C); or
>
> B) Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or $PCO_2$ or bicarbonate levels); or
>
> C) Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

Based on my review of the record, I find that substantial evidence supports the ALJ's finding that Carty's impairments did not meet or medically equal the requirements under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 9.08. First, Carty did not meet the requirements under Listing § 9.08(A). There is no evidence in the record that Carty suffered from sustained disturbance of gross and dexterous movements or gait and station. In fact, in Carty's testimony at the hearing before the

-28-

ALJ, she stated that neuropathy affected her gait "only a little bit" in that she tended to stomp her feet and hit things more often than she used to. (R. at 277.) Dr. Johnson, the state agency physician who reviewed the record, also noted that recent examinations showed that Carty had a normal gait and station and motor function. (R. at 216.) Furthermore, Carty was able to do housework, laundry and dishes, drive an automobile, cook for her family, grocery shop and wash her stepdaughter's hair. (R. at 73-74, 76, 279.) Although Carty was diagnosed with neuropathy, Dr. Chapman, the only podiatrist of record, determined that Carty most likely did not suffer from sensory neuropathy despite her subjective allegations to the contrary. (R. at 218.)

Second, Carty does not meet the requirements in Listing § 9.08(B) . Carty's blood tests during the relevant period show that her bicarbonate levels were within the normal range, and there is no evidence regarding her pH or $PCO_2$ levels. (R. at 196, 198, 227, 228, 240 , 250, 261.) Therefore, Carty does not meet Listing § 9.08(B).

Third, substantial evidence does not support a finding that Carty met the requirements under Listing § 9.08(C). Carty was not diagnosed with a visual impairment, and during her testimony at the hearing before the ALJ, she stated that she was recently told by an optometrist that her eyes were fine. (R. at 281.) Since Carty did not meet the requirements of any subsection under Listing § 9.08, this court finds that substantial evidence supports the ALJ's finding that Carty did not meet the listing for diabetes mellitus.

*IV. Conclusion*

-29-

For the foregoing reasons, I will overrule Carty's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Carty's claim for benefits to the Commissioner for further consideration.

An appropriate order will be entered.

DATED:    This 4ᵗʰ day of May, 2006

SENIOR UNITED STATES DISTRICT JUDGE